UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

For Online Publication Only

-----------------------------------------------------------------------X
EDWARD JORDAN and KELLY JORDAN,

                  Plaintiffs,

    v.-

TUCKER, ALBIN AND ASSOCIATES,
INCORPORATED, KENNY OLTMANNS a/k/a
JIM WILSON, RMS INDUSTRIES, INC.,
RELIANCE MECHANICAL SERVICES, INC.,
SPEEDY LIEN, INC., and MARK NASH,

                  Defendants.
-----------------------------------------------------------------------X

## MEMORANDUM & ORDER
13-cv-6863 (JMA) (SIL)

**FILED**
**CLERK**

5/19/2017 4:59 pm

**U.S. DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
**LONG ISLAND OFFICE**

**APPEARANCES:**

Joseph Mauro
The Law Office of Joseph Mauro, LLC
306 McCall Avenue
West Islip, NY 11795

Peter Francis Barry
Barry & Helwig, LLC
2701 University Ave SE, #209
Minneapolis, MN 55414
    *Attorneys for Plaintiffs*

Aaron R Easley
Sessions Fishman Nathan & Israel LLC
3 Cross Creek Drive
Flemington, NJ 08822
    *Attorneys for Defendants/Cross-Claimants/Cross-Defendants Tucker Albin
    and Associates, Incorporated, and Kenny Oltmanns a/k/a Jim Wilson*

Margot Lee Ludlam
Baxter Smith & Shapiro
99 North Broadway
Hicksville, NY 11801

James F. Hagney
James F. Hagney, Esq., P.C.
55 Elm Street
Huntington, NY 11743

Kevin John Stimpfl
Baxter, Smith & Shapiro
99 North Broadway
Hauppauge, NY 11788
> *Attorneys for Defendants/Cross-Claimants/Cross-Defendants RMS Industries, Inc., and Reliance Mechanical Services, Inc.*

Meng Cheng
40-17 22nd Street, Unit #2,
Long Island City, NY 11101

Stuart S. Zisholtz
Zisholtz & Zisholtz
170 Old Country Road
Mineola, NY 11501
> *Attorneys for Defendants/Cross-Claimants/Cross-Defendants Speedy Lien, Inc. and Mark Nash*

**AZRACK, United States District Judge:**

This case concerns allegedly improper debt collection efforts on a debt owed by plaintiffs to defendant RMS Industries, Inc. Before the Court are motions for summary judgment by all remaining parties.[1] For the reasons below, the Court grants defendants' motion for summary judgement on plaintiffs' claims for conversion, defamation, abuse of process, and violation of New York General Business Law § 349. The Court also grants the motion by defendants Speedy Lien, Inc., and Mark Nash's for summary judgment on plaintiffs' claim under the Fair Debt Collection Practices Act ("FDCPA"). The Court denies defendants' motions for summary judgment on plaintiff's negligence claims. The Court also denies the motion by defendants Tucker Albin and Associates and Kenny Oltmanns for summary judgment on the issue of damages stemming from

---

[1] Plaintiffs have reached a settlement agreement with RMS Industries, Inc. and Reliance Mechanical Services, Inc. The motions by those defendants are thus no longer before the Court.

their admitted FDCPA violation and on Oltmanns' liability for that violation.  Finally the Court

denies plaintiffs' motion for summary judgment in full.

# I.    BACKGROUND

## A.  Factual Background

Plaintiffs in this case are Edward and Kelly Jordan, a married couple who own a home in

Islip, New York.  (See Deposition of Edward Jordan at 23:18–24:23, ECF No. 118-9.)    Both

plaintiffs work at Second Look Incorporated, a company that "handle[s] claims for insurance

companies." (Deposition of K. Jordan 15:14-17:16, ECF No. 145-6.)  Edward Jordan has been

employed as a president at Second Look since approximately 1989, and in the "last few years" he

also became a partial owner of the company.  (Id.)  Kelly Jordan had worked at Second Look since

approximately 2010 and is responsible for "run[ning] the back office of the company."  (Id.)

For ease of reference, the Court will refer to the defendants in this case by the following

groupings:

- The "Tucker Albin defendants," consisting of Tucker Albin and Associates, Incorporated, a debt collection agency, and Kenny Oltmanns a/k/a Jim Wilson, an employee;

- The "Speedy Lien defendants," consisting of Speedy Lien, Inc., a company that provides services related to the filing and serving of mechanic's liens, and Mark Nash, Speedy Lien's principal; and

- The "RMS defendants," consisting of RMS Industries, Inc. and Reliance Mechanical Services, Inc., mechanical contracting firms.

The facts of this case arise from damage to plaintiffs' home caused by Hurricane Sandy.[2]

(See Jordan Dep. 23:18–24:23.)[3]    After their house was damaged, Edward Jordan filed an

---

[2] As each party has submitted a number of Rule 56.1 statements and responses that are largely unresponsive to one another, the Court relies on the underlying record in setting out the factual background.

[3] Plaintiff Kelly Jordan testified that she "didn't know what [Edward Jordan] was going through" and that Edward Jordan "kept it from" her in order to "shield [her] from things that he was experiencing with what was going on with this company trying to get money from us."  (Deposition of Kelly Jordan, 9:11-25, ECF No. 112-8.)  Kelly Jordan

insurance claim and hired "Harbor Hills" as general contractor to assist with the necessary repairs. (Id. 25:17–26:4; 27:11–24.) In his affidavit, however, Jordan stated that he understood that he was "hiring a company called Axis to do the repairs" and that "Axis is apparently affiliated with Harbor Hills." (Jordan Aff. ¶ 2, ECF No. 138-1.) The record is unclear as to the precise relationship between the two general contractors.

Jordan testified that the general contractors had been "involved in the construction of [the] house" in the first instance, so they "knew [the] house." (Jordan Dep. 28:4–5.) According to Peter Montana, an employee of the RMS defendants, RMS was engaged by the general contractors to provide mechanical contracting work on plaintiffs' house. (Deposition of Peter Montana 9:15–22; 10:20–15, ECF No. 118-3.) After performing that work, RMS sent the general contractors an invoice for the amount of $10,500, dated December 20, 2012.[4] (RMS Invoice, ECF. No. 118-4; see also Montana Dep. 17:9–19:2.) The invoice was addressed to the "Axis Group." (RMS Invoice.)

Edward Jordan testified that the first time he was ever contacted by RMS was when he received a phone call from Montana informing him that "he had not received any money." (Jordan Dep. 40:12–41:5.) Jordan told Montana that his "insurance company wasn't satisfied with Harbor Hills' bill and they were not issuing more payments until the bill was corrected," but Montana was "unsatisfied with that explanation." (Id. at 41:2–5; 44:15–18.) Jordan described his conversations with Montana as "harassing," but also testified that it was "just the constant phone calls" that made it feel like harassment. (Id. at 95:17–25.)

---

further testified that she was not a witness to any of Edward Jordan's conversations relevant to the claims in this case. (K. Jordan Dep, 12:9–13.) Thus, the Court relies on Kelly Jordan's deposition only sparingly.

[4] Montana noted in his deposition that the "original amount was over $16,000" but that RMS sought payment of $10,500 as a settlement amount, after negotiation. (Montana Dep. 20:18-24.)

On February 8, 2013, Montana sent a letter to the plaintiffs noting that, "after countless attempts" to receive payment from the general contractor, RMS had not yet received payment. (RMS Letter, ECF No. 118-5.) The letter stated that Montana was "left with no choice but to contact [plaintiffs] and offer [them] the opportunity to clear up this debt before it becomes necessary to place on lien on [plaintiffs'] property." (Id.) Montana indicated that a lien would be placed on the plaintiffs' property on February 13, 2013. (Id.)

At some point after this letter, Montana called Mark Nash of Speedy Lien, requesting that Speedy Lien put a mechanics lien on plaintiffs' home. (Montana Dep. 25:17–26:8.) Nash instructed Montana to visit Speedy Lien's website, input the necessary information into an online form, and pay Speedy Lien. (Id.) Montana appears to have done this on March 27, 2013, and Speedy Lien sent Montana an email confirming his request for a $10,500 mechanics lien on plaintiffs' home. (Speedy Lien E-Mail, ECF No. 118-6; see also Montana Dep. 23:2–21.) Montana testified that Nash had asked him whether he wanted Nash to serve the lien, to which Montana responded "yes." (Montana Dep. 46:16–21.) Montana explained that he "assume[d] when you place a lien, the whole intention is to get it to somebody to let them know that they're liened." (Id.) Montana believed that the lien had be served on plaintiffs. (Id. at 46:11–13; 70:20–22.)

Jordan testified that Montana had told him that "he would be forced to put a lien on [plaintiffs'] house" and that Jordan "asked him not to." (Jordan Dep. 47:13–23.) At some point, Jordan and Montana "made an arrangement that [Jordan] would come down and give him $5,000 and he would not put the lien on my house." (Id. at 47:25–48:3.) It is not clear when this conversation took place relative to Montana's conversations with Speedy Lien.

Jordan prepared a cashier's check payable to "RMS" for $5,000, dated March 29, 2013. (Jordan Check, ECF. No. 118-7.) In the memo line of the check, Jordan wrote "50% of Balance Good Faith Payment." (Id.) Jordan then delivered the check to RMS, after which Montana notified Nash that he had received the check and asked Nash to stop the filing of the lien. (Montana Dep. 32:18–23; 39:22–41:7.) In response, Nash said to Montana: "Fuck him. He owes you money." (Id. at 41:8–11.) Nash told Montana that it was "too late" to remove the lien because it had already been processed. (Id. at 41:14–19.) Although the record contains a "Notice of Lien" dated March 29, 2013, for the mechanics lien on plaintiffs' home, Montana was not sure whether he had ever received that document. (Id. at 49:22–50:8.) The "Notice of Lien" indicates that it was served on plaintiffs, as well as on the Axis Group, but Nash testified that it was not actually served on any of those entities. (Nash Dep. 82:3–19.) Although Nash intended to serve the lien, he testified that he ultimately failed to do so because Montana told him on March 29, 2013, "not to serve a copy of the lien on the parties involved." (Id. at 83:6–20; 85:7–8.)

After RMS hired Speedy Lien, Montana received an unsolicited phone call from an employee of Tucker Albin whose name he did not remember. (Montana Dep. 50:9–17.) Montana testified that he assumed that Tucker Albin "got [his] name off some lien roles or some sort of customer base." (Id.) The Tucker Albin employee told Montana that he would collect the outstanding debt in 30 days and that there would be no fee. (Id.) Montana then decided that he "had nothing to lose" and engaged Tucker Albin. (Id. at 50:18–21.)

Since he had not been served with notice of the lien, Jordan first learned about the lien when he received a call from "Jim Wilson" at Tucker Albin.[5] (Jordan Dep. 52:15–22; 57:11–15.) Jordan told Wilson that he had already paid Montana "some money," to which Wilson responded

---

[5] In this "Factual Background" section, the Court uses the names "Jim Wilson" and "Wilson" to refer to defendant Oltmanns because the relevant depositions refer to him by that name.

in a "sarcastic" and "demeaning" manner, "Well, Ed, you paid this so you admitted that you owed it. Either you finish up paying it or I'm going to foreclose on your house." (Id. at 57:11–22.) Jordan testified that he had "multiple" conversations with Wilson that were "always unpleasant" and in which Wilson was "mocking, ridiculing, [and] laughing," but that he never tried to contact Montana to ask why he had resorted to hiring a collections agency. (Id. at 57:23–58:4; 62:11–17.) Jordan testified that, at this time, he was "already stressed enough recovering from Hurricane Sandy" and that his conversations with Tucker Albin were "a breaking point." (Id. at 62:20–24.) Kelly Jordan testified that Edward Jordan was "stressed about the whole situation"—including the phone calls from Wilson and the mechanic's lien—and that, as a result, "[h]e started smoking again, he wasn't happy we weren't getting along, he gained weight, he was constantly stressed, he was quiet. We kind of stopped talking." (K. Jordan Dep. 61:4-25.)

Montana testified that Tucker Albin's collection efforts were "horrendous, appalling, [and] not successful at all." (Montana Dep. 51:18–22.) Montana explained that Tucker Albin was "harassing [plaintiffs'] entire family, including children" and that as soon as Montana learned of that, he "discharged him immediately" and then the Tucker Albin employee then "started harassing [Montana] for his collection fee for terminating him before he was able to collect his fee." (Id. at 59:4–11.) Because the Tucker Albin defendants have conceded liability for FDCPA violations, the Court does not set out the details of Tucker Albin's collection efforts here.

### B. **Procedural History**

This action commenced on December 5, 2013, when plaintiffs filed a complaint against all defendants. On September 5, 2014, plaintiffs filed the First Amended Complaint ("FAC"), which is the operative complaint in this action. (ECF No. 52.) Like the original complaint, the FAC asserts a number of causes of action against the defendants under both the FDCPA and under New York law. Those claims are as follows.

- Against Tucker Albin, plaintiffs assert causes of action for violations of the following provisions of the FDCPA: 15 U.S.C. §§ 1692c(a); 1692c(b); 1692d; 1692d(1); 1692d(6); 1692e; 1692e(1)–(5); 1692e(7)–(8); 1692e(10)–(11); 1692f; 1692f(1); 1692f(6); and 1692g(a) (FAC ¶¶ 51–52);

- Against Speedy Lien, plaintiffs assert causes of action for violations of the following provisions of the FDCPA: 15 U.S.C. §§ 1692e; 1692e(3)–(5); 1692e(9)–(11); 1692f; 1692f(1); 1692f(3); 1692f(6); and 1692g(a) (FAC ¶¶ 53–54);

- Against all defendants, plaintiffs assert a cause of action for violation of New York General Business Law Section 349 ("GBL § 349") (FAC ¶¶ 55–59);

- Against all defendants, plaintiffs assert a cause of action for "negligent debt collection and grossly negligent debt collection" apparently premised on allegedly criminal violations of Article 29H of the New York General Business Law and sections 478, 484, and 485 of the New York Judiciary Law (FAC ¶¶ 60–66);

- Against all defendants, plaintiffs assert a cause of action for negligence per se apparently premised on allegedly criminal violations of Article 29H of the New York General Business Law and sections 478, 484, and 485 of the New York Judiciary Law (FAC ¶¶ 67–75);

- Against all defendants, plaintiffs assert a cause for conversion under New York law (FAC ¶¶ 76–79);

- Against all defendants, plaintiffs assert a cause for defamation under New York law (FAC ¶¶ 80–89); and

- Against all defendants, plaintiffs assert a cause for abuse of process under New York law (FAC ¶¶ 90–99).

On September 16, 2014, the Speedy Lien defendants filed an answer to the FAC, which included cross-claims against all other defendants. (ECF No. 54.) On September 23, 2014, the RMS defendants filed an answer to the FAC, which included cross-claims for contribution and indemnification against all other defendants. (ECF No. 58.) On October 1, 2014, the Tucker Albin defendants filed an answer to the FAC, which included cross-claims against all other defendants. (ECF 66.)

The Speedy Lien defendants subsequently filed a reply answer to RMS's cross-claims,

denying the allegations underlying those claims; they do not appear to have answered the Tucker Albin defendants' cross-claims. (ECF No. 63.) The RMS defendants filed two reply answers to all cross-claims against them, denying the allegations underlying those claims. (ECF No. 70; ECF No. 72.) The Tucker Albin defendants do not appear to have filed reply answers to any of the cross-claims against them.

Discovery closed on January 14, 2016, and on January 15, 2016, all parties filed pre-motion letters informing the Court of their intention to file dispositive motions. (ECF Nos. 106, 107, 108, and 109.) The Court set a briefing schedule, and the following motions were fully briefed as of June 30, 2016.

First, the Speedy Lien defendants moved for summary judgment on all of plaintiffs' claims against them: the FDCPA claims, the state law claims, and the cross-claims. (Speedy Lien Mot., ECF No. 112.) In the situation where the Court grants summary judgment on the FDCPA claim, Speedy Lien also moves, in the alternative, to dismiss the state law claims for lack of subject matter jurisdiction. (Id.)

Second, the RMS defendants have moved both to dismiss plaintiff's complaint under Rule 12(b)(1) for lack of subject matter jurisdiction and for summary judgement on all of plaintiff's claims. (RMS Mot., ECF No. 117.) At a conference on May 17, 2017, however, plaintiffs notified the Court that they had reached a settlement agreement with the RMS defendants. Thus, neither plaintiffs' claims against the RMS defendants nor the RMS defendants' motion for summary judgment remain pending before the Court.

Third, the Tucker Albin defendants have moved for partial summary judgment. (Tucker Albin Mot., ECF No. 134.) The Tucker Albin defendants concede that Tucker Albin violated the FDCPA, but argue that plaintiffs are entitled only to statutory damages and not to any "actual

damages." (Tucker Albin Mem. at 3; ECF No. 134-1.) The Tucker Albin defendants have moved for summary judgment on all of plaintiffs' remaining claims, including the FDCPA claim against Oltmanns. (Id.)

Fourth, plaintiffs have moved for partial summary judgement against (a) the Tucker Albin defendants on their GBL § 349 and defamation claims and (b) the Speedy Lien defendants on the FDCPA and GBL § 349 claims. (Pl's Tucker Albin Mem, ECF No. 129-1; Pl's Speedy Lien Mem., ECF No. 137-1.)

## II.    DISCUSSION

### A.  Standard for Summary Judgement

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585–87 (1986). The movant bears the burden of demonstrating that "no genuine issue of material fact exists." Marvel Characters, Inc. v. Simon, 310 F.3d 280, 286 (2d Cir. 2002) (citations omitted). "An issue of fact is 'material' for these purposes if it 'might affect the outcome of the suit under the governing law,'" while "[a]n issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Konikoff v. Prudential Ins. Co. of Am., 234 F.3d 92, 97 (2d Cir. 2000) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

When determining whether any material facts are in dispute, the court "must examine the evidence in the light most favorable to, and draw all inferences in favor of, the non-movant[.]" Marvel Characters, 310 F.3d at 286 (citing Matsushita, 475 U.S. at 587; Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000)). To defeat a properly supported motion for

summary judgment, "the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" <u>Matsushita</u>, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)). The nonmoving party, however, "must do more than simply show that there is some metaphysical doubt as to the material facts." <u>Id.</u> at 586 (citations omitted). Mere conclusory allegations, speculation, or conjecture will not avail a party resisting summary judgment. <u>See</u> <u>Shannon v. New York City Transit Auth.</u>, 332 F.3d 95, 99 (2d Cir. 2003). Unless the non-moving party produces "significant probative evidence" demonstrating that a factual dispute exists, summary judgment is appropriate. <u>Anderson</u>, 477 U.S. at 249.

### B.  Supplemental Jurisdiction

Where the district court "lacks the statutory or constitutional power" to adjudicate a case, that case may properly be dismissed for lack of subject matter jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1). <u>Makarova v. United States</u>, 201 F.3d 110, 113 (2d Cir. 2000). The party asserting the existence of subject matter jurisdiction—here, plaintiffs—bears the burden of proving subject matter jurisdiction by a preponderance of the evidence. <u>Id.</u> (citing <u>Malik v. Meissner</u>, 82 F.3d 560, 562 (2d Cir. 1996))

Under 28 U.S.C. § 1367(a), however, district courts may exercise supplemental jurisdiction "over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." A district court has the discretion to "exercise supplemental jurisdiction over state law claims even where it has dismissed all claims over which it had original jurisdiction" provided, however, that there exists a proper basis for original federal jurisdiction. <u>Nowak v. Ironworkers Local 6 Pension Fund</u>, 81 F.3d 1182, 1187 (2d Cir. 1996) (citing <u>Cushing v. Moore</u>, 970 F.2d 1103, 1106 (2d Cir. 1992); <u>In re Joint Eastern and Southern Dist. Asbestos Litig.</u>, 14 F.3d 726, 730 n. 2 (2d Cir. 1993)).

Thus, where a district court dismisses federal claims for lack of subject matter jurisdiction, it cannot exercise supplemental jurisdiction over remaining state claims. See id.

As detailed below, the Court is granting summary judgment on plaintiffs' FDCPA claims against the Speedy Lien defendants, leaving only state law claims against those defendants. Since the very same set of facts underlie those state law claims and the federal claims still before the Court, however, the Court continues to exercise supplemental jurisdiction over the claims remaining against the Speedy Lien defendants. Thus, the Speedy Lien defendants' motion to dismiss for lack of subject matter jurisdiction is denied.

### C. **The Fair Debt Collection Practices Act**

The FDCPA was created as a response to the "use of abusive, deceptive, and unfair debt collection practices by many debt collectors." 15 U.S.C. § 1692(a). The FDCPA was created in order "to eliminate abusive debt collection practices by debt collectors, to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses." 15 U.S.C. § 1692(e). The FDCPA allows for government enforcement, but also grants a private right of action to any consumer who receives a communication from a debt collector that violates the FDCPA. 15 U.S.C. §§ 1692l; 1692k.

To plead a FDCPA claim, a plaintiff must show that "(1) he has been the object of collection activity arising from consumer debt; (2) the defendant is a "debt collector" as defined by the FDCPA; and (3) the defendant has engaged in an act or omission prohibited by the FDCPA." Daniels v. US Bank Nat'l Ass'n, No. 15-cv-5163, 2016 WL 5678563, at *2 (E.D.N.Y. Sept. 28, 2016)

The FDCPA applies only to debt collectors, which the Act defines as "any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of

which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another." 15 U.S.C. § 1692a(6). Creditors, defined as "any person who offers or extends credit creating a debt or to whom a debt is owed," are not subject to the FDCPA. 15 U.S.C. § 1692a(4), see also Carrington v. Chrysler Fin., No. 10-cv-1024, 2010 WL 1371664, at *2 (E.D.N.Y. Apr. 6, 2010) (citing James v. Ford Motor Credit Co., 842 F. Supp. 1202, 1206 (D. Minn. 1994), aff'd 47 F.3d 961 (8th Cir. 1995)).

Here, plaintiffs have alleged that defendants violated a number of sections of the FDCPA. Tucker Albin has conceded liability for such violations. Because the Court finds that Speedy Lien is not a "debt collector" under the meaning of the FDCPA—and is therefore not subject to the FDCPA—the Court need not consider whether Speedy Lien has committed any violations.

### a. **Oltmanns Qualifies as a "Debt Collector"**

Although they have conceded that the conduct at issue here constitutes a violation of the FDCPA, the Tucker Albin defendants have moved for summary judgment on the FDCPA claims against Oltmanns, arguing that Oltmanns does not qualify as a "debt collector" under the meaning of the FDCPA. (Tucker Albin Mem. at 15–17.)

The Court disagrees. District courts in the Second Circuit have held that "[o]fficers or employees of a debt collecting agency may be held jointly and severally liable with the agency if they have acted affirmatively." Zucker v. Porteck Glob. Servs., Inc., No. 13-cv-2674, 2015 WL 6442414, at *6 (E.D.N.Y. Oct. 23, 2015); see also Mayfield v. Asta Funding, Inc., 95 F. Supp. 3d 685, 702 (S.D.N.Y. 2015), appeal withdrawn (Oct. 5, 2015) ("courts within this Circuit have routinely found that employees of debt collectors can be held liable where they personally participate in conduct that violates the FDCPA"); Krapf v. Prof'l Collection Servs., Inc., 525 F. Supp. 2d 324, 327 (E.D.N.Y. 2007) ("While the Second Circuit has yet to rule explicitly on the issue of individual FDCPA liability, many courts, including courts within this district, have

recognized that individual liability may be imposed where the defendant sought to be held liable personally engaged in the prohibited conduct."). The record here is clear that Oltmanns "acted affirmatively" in perpetrating the prohibited conduct. Indeed, Oltmanns appears to have been the sole employee responsible for collecting plaintiffs' debt.

The Court thus denies the Tucker Albin defendants' motion for summary judgment with respect to plaintiffs' FDCPA claim against Oltmanns.

### b. There are Genuine Issues of Material Fact Concerning the Damages Stemming from the Tucker Albin Defendants' FDCPA Violations

The Tucker Albin defendants have conceded liability for violations of the FDCPA but have moved for summary judgment on the issue of damages, arguing that "plaintiffs are not entitled to emotional distress damages" and requesting that the Court "award up to, but no more than, the maximum amount of statutory damages of $1,000." (Tucker Albin Mem. at 3.) For the reasons that follow, the Court denies the Tucker Albin defendants' request, finding that there remain genuine issues of material fact that cannot properly be resolved at summary judgment.

"[A]ny debt collector who fails to comply with any provision" of the FDCPA is liable for (a) "any actual damage" sustained by the debtor, (b) statutory damages not exceeding $1,000, and (c) reasonable attorney's fees. See 15 U.S.C. § 1692k(a). Factors relevant to the determination of the amount of liability include "the frequency and persistence of non-compliance by the debt collector, the nature of such non-compliance, and the extent to which such non-compliance was intentional." 15 U.S.C. § 1692k(b).

"Actual damages" that are recoverable for FDCPA violations include emotional damages. See Baruch v. Healthcare Receivable Mgmt., Inc., No. 05-cv-5392, 2007 WL 3232090, at *3 (E.D.N.Y. Oct. 30, 2007) (collecting cases). Because a reasonable jury could find that plaintiffs suffered emotional damages as a result of the violative practices, summary judgment on

the issue of damages is inappropriate. The Tucker Albin defendants' motion for summary judgment on the issue of damages is therefore denied.

### c.  The Speedy Lien Defendants are not Debt Collectors

The Speedy Lien defendants have moved for summary judgment on the FDCPA claims, arguing that they do not qualify as "debt collectors." (Speedy Lien Mem. at 7–12 (ECF No. 112-4).) Although the parties devote significant portions of their briefs to this issue, neither party cites any illuminating authority. Instead, the parties advance arguments that appear to miss the point.

Plaintiffs characterize the Speedy Lien defendants as "argu[ing] that they are a <u>creditor</u>, as opposed to a debt collector," but it is not clear that this is an accurate characterization of Speedy Lien's position. (Pl's Speedy Lien Mem. at 8–9.) Rather, the Speedy Lien defendant's primary arguments appear to be that they cannot be debt collectors because (a) their name does not appear on the notice of lien and (b) they never served the mechanic's lien on plaintiffs. (<u>See</u> Speedy Lien Mem. at 9.) In response, plaintiffs argue that Speedy Lien is a debt collector based on Mark Nash's admission that it files mechanic's liens "to help the creditor get paid." (Pl's Speedy Lien Mem. at 8.) Plaintiffs do not cite any authority holding that a company engaged in the filing of mechanic's liens qualify as debt collectors, and the Court is unaware of any such authority.

Indeed, case law on this question is exceedingly sparse, both in this circuit and elsewhere. When considering a related question, however, a court in the Northern District of Illinois has held that mechanic's lien <u>notices</u> did not constitute "debt collections covered by the FDCPA." <u>Mladenovich v. Cannonito</u>, No. 97-cv-4729, 1998 WL 42281, at *3 (N.D. Ill. Jan. 30, 1998). The Court agrees with the rationale underlying the <u>Mladenovich</u> court's ruling and finds, by analogy, that the filing of mechanic's liens does not constitute an activity that might qualify the filer as a "debt collector." That is, without more, the filer of such liens is <u>not</u> engaged in a business "the principal purpose of which is the collection of any debts, or who regularly collects or attempts

to collect, directly or indirectly, debts owed or due or asserted to be owed or due another." Rather, the filing of mechanic's liens is, at most, an auxiliary activity related to the existence of an unpaid debt. The mere filing of a mechanic's lien by a third party hired by a creditor does not constitute an attempt to collect the creditor's debt.

In any event, even assuming that service of a notice of lien constitutes the type of activity that might qualify one as a "debt collector," it is undisputed that the Speedy Lien defendants never made any communications whatsoever to plaintiffs. Thus, regardless of their status as "debt collectors," the Speedy Lien defendants never engaged in any "collection activity" that could form the predicate to an FDCPA claim.

As such, the Speedy Lien defendants do not qualify as debt collectors for the purposes of the FDCPA and, even if they did so qualify, no reasonable jury could find that any of the Speedy Lien defendants' activities constituted a violation of the FDCPA. The Speedy Lien defendants' motion for summary judgment on plaintiff's FDCPA claims is therefore granted.

**D.  State Law Claims**

In addition to their federal claims, plaintiffs have also alleged a number of state law claims against all defendants. (See FAC.)

**a.  New York General Business Law § 349**

Plaintiffs assert claims against all defendants for violation of GBL § 349, under which "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful." There are three elements of a claim for violation of § 349: (1) the act or practice at issue must be consumer-oriented; (2) the act or practice at issue must be misleading in a material respect; and (3) the plaintiff must be injured as a result of the act or practice at issue. See, e.g., Spagnola v. Chubb Corp., 574 F.3d 64, 74 (2d Cir. 2009); Rodriguez v. It's Just Lunch, Intern., 300 F.R.D. 125, 145 (S.D.N.Y 2014); Spiro v.

Healthport Techs., LLC, 73 F. Supp. 3d 259, 275 (S.D.N.Y. 2014). Because the record does not support a claim that the allegedly deceptive acts or practices were "consumer-oriented," the Court grants defendants' motion for summary judgment on all of plaintiffs' GBL § 349 claims.

Courts have interpreted the "consumer-oriented" requirement broadly, "requir[ing] merely that the conduct at issue have a broader impact on consumers at large." Koch v. Greenberg, 626 Fed. Appx. 335, 340 (2d Cir. 2015). Under this interpretation, "[s]o long as the conduct at issue can potentially affect similarly situated consumers, the requirement of consumer-oriented conduct is met." Id. Although a plaintiff is not required to show "a repetition or pattern of deceptive conduct" in order to satisfy the "consumer-oriented" element, a plaintiff "must nevertheless 'demonstrate that the acts or practices have a broader impact on consumers at large.'" Allahabi v. N.Y. Life Ins. Co., No. 98-cv-4334, 1999 WL 126442, at *1 (S.D.N.Y. Mar. 10, 1999) (quoting Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A., 85 N.Y.2d 20, 25 (1995).) "Private contract disputes, unique to the parties," however, do not "fall within the ambit of the statute." Oswego, 85 N.Y.2d at 25. That is, in order to qualify as "consumer-oriented," conduct must be "directed toward the consuming public at large or . . . harmful to a general public interest, and not just the individual plaintiff." Dolan v. Select Portfolio Servicing, Inc., No. 13-cv-1552, 2014 WL 4662247, at *7 (E.D.N.Y. Sept. 18, 2014).

In the debt collection context, conduct is "consumer oriented" for these purposes where it was "a normal part of defendants' business," in which case the practice could "have a broad impact on consumers at large." Fritz v. Resurgent Capital Servs., LP, 955 F. Supp. 2d 163, 173 (E.D.N.Y. 2013); see also Rozier v. Fin. Recovery Sys., Inc., No. 10-cv-3273, 2011 WL 2295116, at *5 (E.D.N.Y. June 7, 2011) (debt collection behavior found to be "consumer-oriented" where the

communications at issue were contained in a "form letter, which was likely mailed to thousands of customers").

Here, nothing in the record indicates that the allegedly deceptive acts or practices were consumer oriented. This case concerns neither the use of a form letter nor any evidence that the allegedly violative conduct was a "normal part" of any defendants' business. At most, plaintiffs have submitted evidence that the Tucker Albin defendants engaged in a pattern of deceptive practices in Minnesota but, notably, those practices were targeted at <u>businesses</u>, rather than consumers. (<u>See</u> Minnesota Department of Commerce Press Release, ECF No. 131-8.) Here, by contrast, the conduct at issue centered around individual communications concerning a debt owed by plaintiffs. Thus, no reasonable jury could find that the conduct at issue here was "consumer oriented" as required by GBL § 349. The court therefore need not consider whether the defendants' conduct satisfied the remaining elements of GBL § 349 liability.

Defendants' motion to dismiss plaintiffs' GBL § 349 claims is granted.

**b. <u>Conversion</u>**

Plaintiffs ostensibly advance claims for conversion against all defendants. (Compl. ¶ 76–79.) Those claims rest only on the alleged actions of the Speedy Lien defendants, however, and the Tucker Albin defendants argue that such claims "are not applicable" to them because they "arise out of the alleged filing of a false mechanic's lien." (Tucker Albin Mem. at 3.) The Court agrees and, to the extent that plaintiff's purport to advance claims for conversion against the Tucker Albin defendants, grants summary judgment on such claims. The Speedy Lien defendants have also moved for summary judgment on plaintiffs' conversion claims. (Speedy Lien Mot.)

To establish a cause of action for conversion under New York law, a plaintiff must demonstrate "legal ownership or an immediate superior right of possession to a specific identifiable thing" and "that the defendant exercised an unauthorized dominion over the thing in

question, to the alteration of its condition or to the exclusion of the plaintiff's rights." Singapore Tong Teik PTE Ltd. v. Coppola, No. 04-cv-3440, 2007 WL 2375796, at *3 (E.D.N.Y. Aug. 17, 2007) (quoting Independence Discount Corp. v. Bressner, 365 N.Y.S.2d 44, 46 (App. Div. 2d Dep't 1975)). Conversion, however, applies only to personal property, not real property. See Garelick v. Carmel, 141 A.D.2d 501 (App. Div. 2d Dep't 1988); Boll v. Town of Kinderhook, 99 A.D.2d 898 (App. Div. 3d Dep't 1984); see also E. River Sav. Bank v. Sec'y of Hous. & Urban Dev., 702 F. Supp. 448, 455 (S.D.N.Y. 1988) ("[a]n action for conversion lies only with respect to personal, not real, property").

Here, there is nothing in the record concerning any allegedly "unauthorized dominion" over an item of personal property. Rather, the allegations all concern a piece of real property: plaintiffs' home. Defendants' motion for summary judgment on plaintiffs' conversion claims is therefore granted.

### c. **Defamation**

Plaintiffs advance claims of defamation against all defendants based on allegations that defendants falsely informed third parties "that Plaintiff's house was going to be foreclosed on." (FAC ¶ 81.) Plaintiffs have advanced claims for both defamation and defamation per se. The defendants have moved for summary judgment on plaintiffs' defamation claims.

"To state a claim for defamation under New York Law, the plaintiff must allege (1) a false statement about the plaintiff; (2) published to a third party without authorization or privilege; (3) through fault amounting to at least negligence on [the] part of the publisher; (4) that either constitutes defamation per se or caused 'special damages.'" Thorsen v. Sons of Norway, 996 F. Supp. 2d 143, 163 (E.D.N.Y. 2014) (quoting Thai v. Cayre Grp., Ltd., 726 F.Supp.2d 323, 329 (S.D.N.Y. 2010)). The issue here is whether the record supports a finding that any conduct either constitutes defamation per se or caused "special damages."

Where the requirements of defamation per se are met, "the law presumes that damages will result, and they need not be alleged or proven." Liberman v. Gelstein, 80 N.Y.2d 429, 435 (1992). Defamation per se exists where the alleged statements fall into one of the following four categories: "(i) charging plaintiff with a serious crime; (ii) that tend to injure another in his or her trade, business or profession; (iii) that plaintiff has a loathsome disease; or (iv) imputing unchastity to a woman.'" Zherka v. Amicone, 634 F.3d 642, 645 n. 6 (2d Cir.2011) (quoting Liberman, 80 N.Y.2d at 435).

For the purposes of plaintiffs' per se defamation claim, the only category of statements potentially applicable is statements "that tend to injure another in his or her trade, business or profession." New York courts have held that this "category of slander per se 'is limited to defamation of a kind incompatible with the proper conduct of the business, trade, profession or office itself' and, therefore, the statement "must be made with reference to a matter of significance and importance for that purpose, rather than a more general reflection upon the plaintiff's character or qualities." Rufeh v. Schwartz, 50 A.D.3d 1002, 1004–05 (App. Div. 2d Dep't 2008) (quoting Liberman, 80 N.Y.2d at 436). Thus, the inquiry is context-specific; "charges against a clergyman of drunkenness and other moral misconduct affect his fitness for the performance of the duties of his profession, although the same charges against a business man or tradesman do not so affect him." Liberman, 80 N.Y.2d at 436 (quoting Restatement (Second) of Torts § 573, comment c). Where statements are unrelated to a plaintiff's profession, therefore, those statements do not tend to injure him in his trade, business, or profession and cannot form the basis for defamation per se.

The comments at issue here concern plaintiffs' personal finances. Such claims are entirely unrelated to plaintiffs' profession in the insurance industry. Plaintiffs have not articulated any

convincing argument concerning even an attenuated connection between the claims at issue and their "fitness for the performance of the duties" of their profession. See Liberman, 80 N.Y.2d at 436. Thus, no reasonable jury could find that the comments at issue here constituted defamation per se.

Plaintiffs' next argument in support of their defamation claims is that the comments at issue caused them "special damages." Under New York law, "[s]pecial damages consist of 'the loss of something having economic or pecuniary value which must flow directly from the injury to reputation caused by the defamation." Thorsen v. Sons of Norway, 996 F. Supp. 2d 143, 164 (E.D.N.Y. 2014) (quoting Celle v. Filipino Reporter Enterprises Inc., 209 F.3d 163, 179 (2d Cir. 2000)); see also Matherson v. Marchello, 100 A.D.2d 233, 235 (App. Div. 2d Dep't 1984) (quoting Sack, Libel, Slander and Related Problems, VII 2.2, 345–346). Emotional distress, "hurt feelings," "embarrassment," or "chagrin" do not constitute "special damages." See, e.g., Rubinstein v. N.Y. Post Corp., 488 N.Y.S.2d 331, 333 (Sup. Ct. N.Y. Cnty. 1985); Salomone v. MacMillan Pub. Co., 77 A.D.2d 501, 502 (App. Div. 1st Dep't 1980) (noting that plaintiff "pleads no special damage" where he "claims damages for loss of reputation and for mental anguish"); Marchuk v. Faruqi & Faruqi, LLP, 100 F. Supp. 3d 302, 314 (S.D.N.Y. 2015), appeal withdrawn (Aug. 4 2015) ("General testimony regarding humiliation and loss of reputation' is insufficient" to establish special damages) (quoting Sharratt v. Hickey, 20 A.D.3d 734, 736 (App. Div. 3d Dep't 2005)).

Not only is there no evidence that plaintiffs suffered any economic loss flowing directly from the injury to reputation, there is no evidence of any economic loss whatsoever. At most, the record is such that a reasonable jury might find that plaintiffs suffered emotional damages. As such, plaintiffs have not demonstrated that they suffered any "special damages."

For the foregoing reasons, defendants' motions for summary judgment on plaintiffs' defamation claims are granted.

### d. **Abuse of Process**

Plaintiffs ostensibly advance claims for abuse of process against all defendants. (Compl. ¶ 90–99.) Those claims rest only on the alleged actions of the Speedy Lien defendants, however, and the Tucker Albin defendants argue that the abuse of process claims "are not applicable" to them because they "arise out of the alleged filing of a false mechanic's lien." (Tucker Albin Mem. at 3.) The Court agrees and, to the extent that plaintiffs purport to advance claims for abuse of process against the Tucker Albin defendants, grants summary judgment on such claims.

Plaintiffs incorrectly state that the Speedy Lien defendants have not moved for summary judgment on the abuse of process claims. (See Pl's Speedy Lien Mem. at 25 n.15; Speedy Lien Mot. at 1 (requesting an order "granting summary judgment dismissing the remaining State Causes of Action as against" the Speedy Lien defendants), ECF No. 112.) For the reasons that follow, the Court grants the Speedy Lien defendants' motion for summary judgment on plaintiffs' abuse of process claim.

The New York Court of Appeals has recognized that, "[i]n its broadest sense, abuse of process may be defined as the misuse or perversion of regularly issued legal process for a purpose not justified by the nature of the process." Bd. of Ed. of Farmingdale Union Free Sch. Dist. v. Farmingdale Classroom Teachers Ass'n, Inc., Local 1889 AFT AFL-CIO, 38 N.Y.2d 397, 400 (1975). The Court of Appeals noted that there are "three essential elements" to a claim of abuse of process:

> First, there must be regularly issued process, civil or criminal, compelling the performance or forebearance of some prescribed act. Next, the person activating the process must be moved by a purpose to do harm without that which has been traditionally described as economic or social excuse or justification. Lastly, defendant must

> be seeking some collateral advantage or corresponding detriment to
> the plaintiff which is outside the legitimate ends of the process.

Bd. of Ed. of Farmingdale Union Free Sch. Dist., 38 N.Y.2d at 403 (internal citations omitted); see also Ettienne v. Hochman, 83 A.D.3d 888, 888 (App. Div. 2d Dep't 2011) ("Abuse of process has three essential elements: (1) regularly issued process, either civil or criminal, (2) an intent to do harm without excuse or justification, and (3) use of process in a perverted manner to obtain a collateral objective") (quoting Curiano v. Suozzi, 63 N.Y.2d 113, 116 (1984)).

New York courts appear to accept that the filing of a mechanic's lien can constitute "regularly issued process" so as to support a claim of abuse of process. See, e.g., Green v. Dolphy Const. Co., 187 A.D.2d 635, 637 (App. Div. 2d Dep't 1992); N.Y. State Properties, Inc. v. Clark, 183 A.D.2d 1003, 1005 (App. Div. 3d Dep't 1992); Weaver v. Acampora, 227 A.D.2d 727, 728 (App. Div. 3d Dep't 1996) ("the filing of a mechanics' lien, seeking recovery of an amount reasonably believed to be due for work performed on the property that is the subject thereof, does not, without more, constitute abuse of process"). However, even where a mechanic's lien is "greatly exaggerated" in amount, a claim for abuse of process based on the filing of that lien is improper unless the lien was "filed for a collateral purpose" other than "to enforce claims made for work performed on the property." Key Bank of N. N.Y., N.A. v. Lake Placid Co., 103 A.D.2d 19, 27 (App. Div. 3d Dep't 1984).

Nothing in the record suggests that the mechanic's lien was filed either in a "perverted manner" or in order to "obtain a collateral objective." Indeed, the record establishes that the only purpose underlying the mechanic's lien was to protect the creditor's interest in the debt owed to it. Defendants' motion for summary judgment on plaintiffs' claim for abuse of process is therefore granted.

### e.   **Negligence, Gross Negligence, and Per Se Negligence**

Plaintiffs assert claims against all defendants for "negligent debt collection and grossly negligent debt collection" and for <u>per</u> <u>se</u> negligence premised, in part, on allegedly criminal violations of GBL Article 29H and sections 478, 484, and 485 of the New York Judiciary Law ("NYJL").   Defendants have moved for summary judgment on plaintiff's negligence claims. Plaintiffs oppose defendants' motions, but have not themselves moved for summary judgment on their negligence claims.   (<u>See</u> Pl's Speedy Lien Mot., ECF No. 137; Pl's Tucker Albin Mot., ECF No. 129.)

As an initial matter, plaintiffs do not have a private right of action for violations of any of these statutes.   Rather, GBL Article 29H and NYJL sections 478, 484, and 485 proscribe certain conduct and establish that violations may be criminal.   Although plaintiffs do not have an independent, private right of action for violation of these statutes, they argue that defendants' alleged violations either constitute negligence <u>per</u> <u>se</u> or, in the alternative, are evidence of negligence or gross negligence.

The absence of a private right of action is thus irrelevant to the question at hand: whether the evidence in the record, including evidence of possible violations of those statutes, may support a finding of negligence.   Under New York law, the elements of negligence are: (a) the existence of a legal duty to the plaintiff; (b) a breach of that duty; (c) proximate causation; and (d) damages.   <u>See</u> <u>Luina v. Katharine Gibbs Sch. N.Y., Inc.</u>, 37 A.D.3d 555, 556 (App. Div. 2d Dep't 2007) (citing <u>Eiseman v. State of New York</u>, 70 N.Y.2d 175 (N.Y. 1987)); <u>see</u> <u>also</u> <u>In re Lake George Tort Claims,</u> 461 F. App'x 39, 40 (2d Cir. 2012) (quoting <u>Merino v. N.Y.C. Transit Auth.</u>, 218 A.D.2d 451, 457 (App. Div. 1st Dep't 1996)).   Violation of a statute may constitute negligence <u>per</u> <u>se</u> "if a statute is designed to protect a class of persons, in which the plaintiff is included, from the type of harm which in fact occurred as a result of its violation."   <u>German by</u>

German v. Fed. Home Loan Mortg. Corp., 896 F. Supp. 1385, 1396 (S.D.N.Y. 1995) (citing Prosser and Keeton on Torts, pg. 229–30, 5th Ed.1984; Martin v. Herzog, 228 N.Y. 164 (1920)).  If these criteria are satisfied, the violation of a statute may establish that the defendant owed a duty of care to the plaintiff and breached that duty.  Id.  The statutory violation does not, however, establish that such breach was the proximate cause of the plaintiff's injury; that is a question of fact, and failure to satisfy the causation requirement is fatal to a negligence claim.  Id. (citing Brown v. Shyne, 242 N.Y. 176, 180 (1926)).

The record here contains evidence sufficient for a reasonable jury to find that defendants are liable for negligence.  This includes both evidence concerning the alleged statutory violations and other evidence concerning defendants' conduct.  Thus, defendants' motion for summary judgment on plaintiffs' negligence claims is denied.

Although plaintiffs have not moved for summary judgment on their negligence claims, they nevertheless request that the Court "issue an injunction against [the Speedy Lien defendants] prohibiting them from accepting compensation for advising consumers about mechanic's liens; and prohibiting them from drafting or filing mechanic's liens."  (Pl's Speedy Lien Mem. at 25.)  In essence, plaintiffs have requested a ruling that the Speedy Lien defendants' business practices violate New York law.  That question is not properly before the Court, and the Court issues no opinion on that issue at this time.

### III.    CONCLUSION

For the reasons set forth above, the Court grants summary judgement on plaintiffs' claims for conversion, defamation, abuse of process, and violation of GBL § 349.  The Court also grants summary judgment on plaintiff's FDCPA claims against the Speedy Lien defendants.  The Court denies the remaining motions.

**SO ORDERED.**

Date: May 19, 2017
Central Islip, New York

_____ /s/ (JMA)_____
Joan M. Azrack
United States District Judge